**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4457-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANIELE G. ROMEODISANTILLO,[1]

     Defendant-Appellant.

_____

Argued May 8, 2019 – Decided July 5, 2019

Before Judges Alvarez, Nugent, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 15-12-2378.

Mitchell Jonthan Ansell argued the cause for appellant (Ansell Grimm & Aaron, PC, attorneys; Mitchell Jonthan Ansell and Robert A. Honecker, Jr., of counsel and on the briefs).

William Kyle Meighan, Senior Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel J.

_____

[1] Defendant's surname also appears in the record as "Romeo DiSantillo," and in the State's brief as "Romeo-DiSantillo."

Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the brief).

PER CURIAM

Tried to a jury, defendant Daniele G. RomeoDiSantillo was convicted of first-degree murder, N.J.S.A. 2C:11-3(a) or (b) (count one); first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) or (b) and N.J.S.A. 2C:5-2 (count two); second-degree unlawful possession of a handgun, a .380 Micro Desert Eagle, N.J.S.A. 2C:39-5(b)(1) (count three); second-degree possession of a firearm, a .380 Micro Desert Eagle, for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); second-degree unlawful possession of a handgun, a .357 Magnum revolver, N.J.S.A. 2C:39-5(b)(1) (count five); second-degree possession of a firearm, a .357 Magnum revolver, for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count six); second-degree financial facilitation of criminal activity, N.J.S.A. 2C:21-25(c) (count seven); and second-degree theft by deception, N.J.S.A. 2C:20-4 (count eight).[2]

---

[2] Counts nine and eleven, which charged defendant with third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(4) (count nine) and second-degree conspiracy to hinder apprehension or prosecution, N.J.S.A. 2C:29-3(a)(5), N.J.S.A. 2C:29-3(b)(4), and N.J.S.A. 2C:5-2 (count eleven), were dismissed on the State's motion prior to trial. Co-defendants Hector Calderon and Eric Prosniewski were severed from defendant's trial. Calderon was charged in counts one through four, and Prosniewski in counts ten and eleven.

On May 18, 2017, after denying defendant's motions for a judgment of acquittal under Rule 3:18-2 and a new trial, the judge merged the counts charging murder, conspiracy, possession of the .380 Micro Desert Eagle for an unlawful purpose and possession of the .357 Magnum revolver for an unlawful purpose, and sentenced defendant to a term of thirty years imprisonment subject to thirty years of parole ineligibility. He merged the unlawful possession of the Micro Desert Eagle with the unlawful possession of the Magnum and imposed concurrent sentences of five years subject to forty-two months of parole ineligibility, concurrent to count one. On the financial facilitation of criminal activity charge, the judge imposed a five-year term of imprisonment, subject to twenty-months of parole ineligibility concurrent to count one, along with a $250,000 fine. On the second-degree theft by deception, the judge imposed five years consecutive to the financial facilitation offense. The sentence hearing was conducted May 18, 2017, however, the judgment of conviction (JOC) was not signed until May 23, 2017. On June 1, the JOC was amended to provide that defendant's sentence for murder was subject to the No Early Release Act's eighty-five percent parole ineligibility and five-year term of parole supervision upon defendant's release. See N.J.S.A. 2C:43-7.2. Defendant appeals and we affirm.

3

The State's case was largely circumstantial. Defendant managed Romeo's Pizza and Pasta Factory, a restaurant located on Romeo's Plaza in Jackson. His father owned the pizza parlor and several other businesses, including Casanova's, a restaurant business closed for renovations located next door to the pizza parlor where defendant worked. The victim, Peyman Sanandaji, had been a very successful car salesman. In 2014, he decided to go into the restaurant business with defendant.

Ocean County Prosecutor's Office Detective Sergeant Mark Malinowski, an anti-money laundering specialist and fraud examiner, testified regarding his review of records obtained through multiple search warrants. This included bank accounts for defendant, his wife, and Sanandaji.

In May 2014, the balances in Sanandaji's Capitol One Savings Account and a high-yield checking account were $80,159.68 and $99,123.16 respectively. Steven Kaplan, Sanandaji's certified public accountant, testified that the victim had earned almost one million dollars over the course of four years while working as a car salesman and his highest adjusted gross income was $294,000 in 2013. Defendant's 2014 tax return declared $13,000 in income.

On July 11, 2014, defendant opened a checking account with $100. On July 15, 2014, Sanandaji withdrew $10,000 in cash from his Capital One account

and an additional $70,000, payable to defendant, in the form of a cashier's check. The same day, defendant deposited the cashier's check into his newly opened account.

On July 16, 2014, defendant and Sanandaji signed a certificate of formation for San Romeo Enterprises, LLC (San Romeo). Defendant and Sanandaji each owned a fifty percent interest in San Romeo, which would buy, renovate, and resell homes.[3] The operating agreement also provided that Sanandaji would contribute $80,000 ($70,000 by check and $10,000 in cash) to the business and would receive fifty percent of the monthly profits on the tenth day of each month beginning October 2014.

Defendant withdrew $10,000 in cash from his account on July 17, 2014. The same day, a $3000 cash deposit was made to the bank account of defendant's wife. On July 22, 2014, defendant made a multi-transactional deposit of $30,000 into his wife's account. Over time, he transferred smaller amounts from his wife's account back into his own, totaling $25,150.

---

[3] The victim's surname appears on this document as "Sansandaji."

A-4457-16T2

Malinowski testified that as of September 2014, defendant had either spent or transferred the $70,000 he had deposited in July. His account balance dropped to $101.41.

On October 6, 2014, Sanandaji withdrew $60,000 from his checking account in the form of a cashier's check payable to defendant. The same day, defendant deposited $60,000 into his account. On October 7, 2014, defendant transferred $10,000 to his wife's account. By November 20, 2014, all of the money that defendant had deposited into his wife's account had been spent on non-business related expenses.

Over time, defendant deposited a total of $130,000 into his checking account. As of January 17, 2015, however, his account showed a negative balance.

Meanwhile, Sanandaji continued to withdraw cash from his checking account. Among other transactions, he made two withdrawals on January 14, 2015, one for $7536 and the other for $12,000. Kadia Tavarez, Sanandaji's girlfriend, testified that in addition to making cash investments in two pizzerias, Sanandaji purchased "things" for both pizza locations, and he and she put together the décor at one location. He never received any returns from the pizzeria businesses.

A-4457-16T2

A March 6, 2015 unsigned partnership agreement regarding Romeo's Pizza in Jackson provided that defendant and Sanandaji would each own a fifty-percent share of the business, each make capital contributions of $145,000 and $155,000, respectively, and that defendant would manage the daily operations. A second March 6, 2015 unsigned partnership agreement referred to a Romeo's Pizza and Pasta Factory in Spotswood. The second agreement stated defendant and Sanandaji would each contribute $12,500 for a twenty-five and one-half percent share in the business. It did not disclose who owned the remaining forty-nine percent, but provided that Hector Calderon would manage the day-to-day operations.

On March 9, 2015, Sanandaji withdrew another $12,000. By April 2015, Sanandaji's two accounts had balances of $11.75 and $5010.38.

Earlier on November 1, 2014, defendant's father agreed to sell Calderon the Spotswood pizzeria for a purchase price of $150,000, including a $5000 down-payment, with the balance of $145,000 to be paid within ninety-six months. Defendant's father and Calderon signed an eight-year lease for the pizzeria premises.

Sometime after Christmas 2014, Sanandaji visited Douglas Burke, a former co-worker. The two men discussed guns and Burke displayed a .357

Magnum that belonged to a friend. Sanandaji took the weapon without Burke's knowledge.

Tavarez testified that by April 2015, she and Sanandaji's lifestyle had significantly changed. He told her that they had to cut back on their expenses and would not be able to splurge as they had before. The victim's only reported income in 2015 was $2300 from the car dealership.

On April 7, 2015, Sanandaji sent a text message to Tavarez, which read: "In [forty-eight] hours we will be okay again," with a dollar sign. She responded "[g]ood," to which he replied: "$$ Very Good $$."

At 5:44 p.m. the previous day, however, defendant had sent a text message from his phone to an unidentified individual, saying: "But. He thinks. This. Big. Payday is coming and it's not." Ocean County Prosecutor's Office Detective David Brubaker reviewed defendant's cell phone data and testified that the entire text thread referred to Sanandaji.

On April 8, 2015, defendant sent several text messages to Jackson Township Police Department Sergeant John McBride asking to speak with him to get his opinion on something important. McBride responded: "K, for okay," but did not hear from defendant afterwards.

A-4457-16T2

On Thursday, April 9, 2015, at approximately 11:00 or 11:30 a.m., Jose Garcia, a Romeo's Pizza employee, saw Calderon talking to defendant at the restaurant in Jackson.  Defendant left, and at 12:30 p.m. met Sanandaji for lunch at Jersey Smokes in Romeo's Plaza.  At 2:00 p.m., Calderon left Romeo's Pizza and called a driver that he used several times a week.  The driver, Paulino Palaez, drove Calderon home.

Sometime between 1:00 and 2:00 p.m., defendant called an acquaintance, Marlboro Police Department Officer Charles Meglio, Jr., and met with him at the "smoke shop" near Romeo's Pizza.  Meglio said defendant was agitated and aggravated and became a "little loud."  When they went outside, defendant told him he had gotten involved in a business with someone named Pete.[4]  Defendant owed "Pete" money, which he planned to repay after his mother sold her house in Italy, but feared retaliation if he did not "pay the money back."  Defendant claimed Pete had threatened him and his family if he did not get the money.  Meglio advised defendant to call the police.

At approximately 5:00 p.m. Calderon returned to Romeo's Pizza.  At 6:00 p.m., Garcia saw him leave the restaurant with a box of coffee from the top of a refrigerator.  Six months earlier – after defendant and the victim had become

---

[4]  Defendant testified that he called the victim Peter.

friends – Garcia had seen two guns behind two coffee boxes there. Garcia denied seeing a holster, ammunition, or a magazine in the pizzeria during the six months prior to the shooting. He testified that Romeo's Pizza stored supplies in Casanova's and that he used a key to enter the closed restaurant through the front door.

At 7:08 p.m. on April 9, 2015, Sanandaji sent a text message to Tavarez that read: "Everything will work out." At 7:12 p.m., after stopping to get food for himself and defendant, he texted defendant that he was "pulling in." Defendant was at his desk in the office at Casanova's when Sanandaji arrived; Calderon was also there. According to defendant, they were eating and drinking when Calderon and Sanandaji began to argue. Calderon shot the victim.

Sometime between 8:00 and 8:30 p.m., Calderon returned to Romeo's Pizza and told Garcia that defendant said he could have money for a taxi. Garcia gave him the cash and Calderon left. At 8:19 p.m., Calderon called Palaez for a ride. Palaez picked him up at 8:40 p.m. and drove him home.

Ocean County Prosecutor's Office Detective Brian Haggerty testified that defendant asked Calderon to return, which he did at approximately 10:00 p.m. An outside video showed defendant and Calderon at 9:59 p.m. walking along Romeo's Plaza towards Romeo's Pizza.

Garcia also saw Calderon and defendant return to the pizzeria around 10:00 p.m. Calderon again called Palaez for a ride. At 10:51 p.m., he picked up Calderon and took him to his house. Calderon was in a "serious mood" and appeared intoxicated.

At 10:47, defendant phoned Calderon. At 10:53 p.m., he called Eric Prosniewski, another Jackson Police Department officer, and told him that someone was hurt, but did not mention a shooting. Afterwards, he called Officer Johnny Mack.

Jackson Police Department Officer Michael Kelly testified that on April 9, 2015, he was in his squad car at Romeo's Plaza in connection with an unrelated matter. As he drove away, at approximately 11:00 p.m., he saw defendant talking on a cell phone while pacing in front of Romeo's Pizza. Kelly waved and defendant made a friendly gesture, "a normal wave, hi, hello."

Just after 11:00 p.m. on April 9, 2015, defendant called McBride, which was unusual. He asked McBride: "[I]f it was you and I and a third person and something bad was done to one person, would I be in trouble if I had, for lack of other words, witnessed what had happened." McBride replied that it depended on whether the person was aware that something was going to happen,

but said he could not give advice and suggested defendant consult with an attorney.

At 11:07 p.m., Kelly was dispatched to return to Romeo's Plaza for a "welfare check." When he arrived a few minutes later, he saw defendant on his phone outside Romeo's Pizza. Defendant waved again, but "more distinct, like he was flagging me down." Kelly pulled alongside defendant, who reported a shooting, and said he knew who did it and where to find the body and gun. Although the temperature was thirty-eight degrees, defendant "appeared very nervous, . . . his words were very wavering, he was sweating profusely, he was stuttering, shaking, couldn't make eye contact when we were talking to each other." Defendant told Kelly that he had "a few drinks earlier," but said he was "perfectly sober now." Kelly asked defendant why he called Prosniewski rather than 911. Defendant responded that he was scared.

Kelly met defendant at the back door of Casanova's, which was propped open. Before going inside, defendant told Kelly that he was "98.99 percent sure" that the gun was in the sewer. He did not hear the gun go off, but said he saw the shooter and heard a noise that sounded as if someone "dumped something there." After discarding the gun, the shooter drove away. Defendant was "150 percent positive" there was a body inside the restaurant, saying the victim was

one of his best friends and an ex-employee was the shooter.  Kelly crossed through the kitchen into the restaurant's main room and saw the body on the floor across from the bar.

Defendant identified the victim as Sanandaji, the shooter as Calderon, and said the shooting happened "[a] couple hours ago."  When Kelly asked why defendant never "flagged" him when he and another officer were parked in the lot around 8:00 p.m., defendant responded that he was trying to get Kelly's attention.

Defendant told Kelly he was sitting at his desk with Calderon when Sanandaji arrived with food.  Around 8:30 or 9:00 p.m., Calderon and Sanandaji got into an argument "over like something like weed or something like that and [Calderon] just popped him, man."

Defendant had no idea why Calderon shot Sanandaji, but that the victim had "a lot of . . . unregistered firearms" in his house.  He thought the police might also find a "few firearms in the basement" of the victim's mother's home and "maybe like a grenade or some shit like that."  He gave Kelly the victim and Calderon's addresses, and offered to drive Kelly to Calderon's house.  He also agreed to go to police headquarters.

At 12:17 a.m. on April 10, 2015, Detective Matthew Scutti of the Crime Scene Investigations Unit (CSI) of the Ocean County Sheriff's Department met other officers for an initial walk-through of the crime scene. After seeing the victim's body in the bar area, his feet inside the office, they went back outside and waited for a search warrant.

When Scutti and other members of CSI executed the search warrant at 8:00 a.m. on April 10, 2015, they took photographs, videos, and collected trace evidence from the kitchen, restaurant, bar and dance areas, foyer, office, and vacant liquor store. They recovered a .380 undischarged bullet cartridge on the bar, two shell casings on the floor of the office, one shell casing in the corner of the liquor store near its threshold with the bar, and a discharged bullet outside of the office. A coffee box inside the office contained a magazine with .380 undischarged rounds. Also in the office was a gun cleaning kit, a box of .357 undischarged cartridges, and a gun holster. Water bottles stood on the counter, latex gloves on a table, and a cup of liquid on the bar. The officers retrieved a cell phone and wallet from the victim's pocket.

Other officers at the scene recovered a Micro Desert Eagle semi-automatic .380 caliber handgun inside a plastic bag in a sewer behind Casanova. The weapon had one undischarged round in the magazine and one in the chamber.

A-4457-16T2

The .380 and its components were photographed, swabbed by an in-house forensic scientist for DNA samples, and examined for fingerprints. The evidence then went to the ballistic laboratory.

A fully loaded Taurus International .357 Magnum revolver was found inside a bag of flour in the kitchen. Garcia testified that he had seen the .357 Magnum and the .380 firearm inside the pizzeria prior to April 9, 2015.

Defendant was taken to the Jackson Police Department to give a witness statement. Detective Michael O'Hearn, a crime scene investigator with the Ocean County Sheriff's Department, photographed defendant, collected his fingerprints, swabbed his fingernails, checked his hands for gunshot residue, and collected his clothing. He and a sheriff's officer then went to the victim's residence, where they collected financial paperwork and documents, including the two partnership agreements. No handguns were found in the premises, but O'Hearn found latex gloves in the trash can.

Meanwhile, beginning at 12:55 a.m. on April 10, 2014, Haggerty and Detective Mitch Cowit of the Jackson Police Department interviewed defendant. In the videotaped statement, which was played for the jury, defendant said he had known the victim for about two years and they had done some business together, but "[n]othing really solid." He stated they intended to purchase

15

Romeo's Pizza from his father. The victim was going to pay $300,000 or $400,000, explaining his friend made "good money" as a car salesman. On April 9, 2015, he agreed to meet Sanandaji for dinner, and asked Calderon to join them. Calderon arrived "a little bit tipsy."

As they were eating and drinking, Calderon and Sanandaji began to argue, defendant assumed, over money. At some point, Calderon walked out of the office and Sanandaji followed him. Defendant asked what they were doing, at which point, Calderon pulled out a gun and shot the victim, who had been standing in the doorway. The victim looked at defendant and said: "[O]h, you're going to let him shoot me." Calderon shot the victim again. Defendant told the detectives that at the time of the shooting Calderon was wearing latex gloves. There was a box of gloves on the bar.

Immediately afterwards, Calderon pointed the gun at defendant, threatening to shoot him. Unsure whether Calderon was going to kill him too, defendant sat "frozen" in his chair and watched as Calderon left through the back door, tossed the gun in the sewer, and walked away. He later said Calderon knelt down and put the gun in the sewer.

At 10:57 p.m., defendant called Calderon and they spoke for more than seven minutes. He called Calderon a third time, but got his voicemail.

According to defendant, Calderon kept a lot of guns in his house and always threatened "women and kids." Calderon claimed he had grenades in his house, although defendant never saw them. Defendant had seen Calderon carrying a gun only once. He repeatedly offered to take the detectives to Calderon's house.

Towards the end of the interview, Cowit asked if defendant would "have a problem making a phone call to [Calderon] and letting us record that." Defendant replied: "Yeah. No, no problem. No problem at all." Haggerty asked if he was "willing to, you know, talk to him about what's going on here tonight" and Cowit added: "We would be recording that and it would become evidence. You okay with that, voluntarily." Defendant answered: "I mean, yeah. I don't see why not."

Beginning at 3:45 a.m. on April 10, 2015, Haggerty obtained defendant's consent to search his cell phone, and to collect fingerprints and DNA. In his second recorded statement, also played in court, defendant again offered to take the detectives to Calderon's house. At 5:30 a.m., defendant accompanied Haggerty and Cowit to show them Calderon's home.

After returning to the Jackson police headquarters, at 7:46 a.m. on April 10, 2015, defendant made a consensual intercept call on his cell phone to Calderon. Before the call, Haggerty suggested defendant talk to Calderon about

17

the location of the clothes he wore during the shooting, the gun, and his whereabouts. Calderon spoke Spanish during the call and defendant spoke some Italian (referred to as "IT" in the transcript). A court-certified Spanish interpreter transcribed the conversation and certified that the transcription was a "true and correct" translation from Spanish to English. That recording was played for the jurors, who received copies of the written translation.

During their conversation, Calderon told defendant several times that he should leave the country. For example, when defendant asked why Calderon left him and what were they "going to do now," Calderon replied: "[I]t's best you go buy a ticket and go to Italy." When defendant replied that he did not do anything and that it was Calderon who shot Sanandaji and disappeared, Calderon repeated defendant should "take off" and "go to Italy," because it was "best that way." At one point, defendant said: "I have to talk about this then." Calderon answered: "It's best that we don't get together, so nothing is known." Calderon repeatedly told defendant that the "only way out" was to go to Italy, explaining "you knew that this was going to happen," it "is the only option you have," and "we'll see what we do later."

> HC:  It[']s best I go open the pizzeria [U/I][5] if you
> want I'll see you over there.  Understand me?

---

5 The legend defined "[U/I]" as "Unintelligible (English)."

> [U/I] [M]y advice is it's best that you go to Italy, and no one knows anything. Understand?

DD: I don't know.

HC: Eh, we won't have, we won't have any communication about anything . . . and no one knows anything.

After that, defendant said he needed to charge his cell phone and would call Calderon back.

Haggerty and Cowit interviewed defendant a third time beginning at 8:39 a.m. on April 10, 2015. Defendant admitted asking Calderon to "come back" on the night of the shooting, because he knew he and the victim were going to talk about money. He wanted Calderon there for "moral support," fearing that the victim "was going to do something to my family." He and Calderon got to the office at Casanova's about ten to twenty minutes before the victim.

Defendant said Calderon showed him a gun while they were waiting for Sanandaji. He recalled seeing the gun "[m]aybe once before." Defendant denied asking Calderon to shoot the victim or offering Calderon any money to do so.

Defendant admitted that Sanandaji had given him $150,000 for a business investment in a pizzeria. He introduced the topic of money as they ate, assuring Sanandaji that he would have some money in another week when his mother returned from Italy after selling her house. They argued, and he and Calderon

19

were drinking. He was "a little shaken up," but did not feel threatened by Sanandaji, he "didn't think the kid was going to get a bottle and crack it over my head or, you know, hit me."

The argument escalated and Calderon got a "little loud." There was a "tussle" in the office. Calderon pulled out the gun, stepping outside the office, and the victim followed. Defendant repeated that Calderon shot the victim in the doorway, that the victim grabbed his side and spoke after the first shot, and fell after Calderon fired two more shots. He saw Calderon bend down and taste the victim's blood.

Defendant did not call for help fearing that Calderon would do something to him. He said Calderon "didn't bluntly come out and threaten me," but he felt threatened by Calderon's repeated references to women and children in general. He watched as Calderon walked outside and put the gun in the sewer. Defendant said he was in shock, telling the detectives: "I let my best friend die, 'cause I'm an asshole and I'm a scumbag."

Defendant did not know how shell casings, an extra magazine, a clip with bullets, and a holster ended up in the office. He did not recall seeing Calderon put on gloves, but said a box of gloves used for cleaning had been left in the

20

office.    When asked why Calderon shot Sanandaji, defendant responded Calderon "was just heated.  He was drunk and he just did something stupid."

Towards the end of the interview, defendant acknowledged that Calderon worked with his father for a long time and wanted to buy a pizzeria.  Calderon had invested $5000 in the business and "maybe another 1500" or "two grand."  Defendant gave Calderon $5000 in cash and "the two grand plus whatever money he put into that."  He later said that Calderon's investment in the restaurant "was supposed to be eight [thousand]."

Members of the investigative team executed a search warrant of Calderon's residence and collected two phones.  Calderon was taken to the Monmouth County Prosecutor's Office, where a gunshot residue evidence collection kit was used on his hand.

Scutti testified that the same day, two detectives executed a search warrant of defendant's residence.  They recovered a cashier's check and a Jaguar sedan, registered in the victim's name.  Based on defendant's statement, a State Police bomb unit was dispatched to the victim's house and to the victim's mother's house, but found no bombs, grenades, firearms or ammunition there.

The pathologist who performed the autopsy found the victim's only injuries were three gunshots.  The first bullet struck the victim's spine causing

immediate paralysis below the waistline. The second entered the victim's right temple and exited by the right ear, fracturing his skull. The third bullet entered the victim's right frontal scalp, passing through the brain and immediately killing him. The pathologist found gunpowder "stippling" around the entrance wounds to the head, suggesting the gun was fired at close range—from six to twelve inches away. Analysis of the victim's stomach contents established he had eaten within an hour before his death.

The State's expert in nuclear forensic DNA analysis matched defendant's DNA to the major DNA profile obtained from the .357 Magnum, specifically from swabs of the "chamber release, trigger, chamber's ejector and decocker." The expert could not identify DNA contributors on the plastic bag that contained the .380 handgun and found no identifiable DNA from defendant on the .380 Desert Eagle or the shell casings.

The State's fingerprint expert testified that Calderon's and the victim's fingerprints were found on bottles recovered from the office. Defendant's fingerprints were found on a water bottle recovered from the liquor store. She also found defendant's fingerprint on the back of a box of latex gloves. However, no fingerprints were found on the guns, bullets, shell casings, magazines, holster, or gun box.

22

The State's expert in firearms identification, forensic ballistics, and gunshot residue conducted a ballistics examination of the .380 semi-automatic handgun. Three projectiles and three shell casings, one from the office floor, had been discharged from the .380. Based on his examination of the victim's clothing, the firearm was discharged somewhere beyond eighteen to twenty-four inches from the victim. The .357 caliber Magnum was operable and loaded.

The defense called defendant's father and six character witnesses. Defendant's father testified that although he was the record owner of the businesses, he considered the properties to belong to all of his children. He understood that defendant and Sanandaji were going to help Calderon with the purchase of the pizzeria, but was not aware of any business relationship between Sanandaji and defendant.

Regarding Calderon's initial statement, the parties stipulated as follows:

> On April 10th, 2015, Hector Calderon made the following statements to police: Hector Calderon stated that he has known Daniele Romeo DiSantillo for 20 years. Hector Calderon stated that on April 9th, 2015, he was at Romeo's Pizza and Pasta, Jackson, New Jersey, but left at approximately 8 p.m. Hector Calderon stated that at approximately 9 p.m. Daniele Romeo DiSantillo contacted him and asked him to come back to the pizzeria. Hector Calderon stated that he returned to Romeo's Pizza and Pasta at approximately 10 p.m. and, upon his return, Daniele Romeo DiSantillo stated that he had taken him out of

23

the partner of the middle. Hector Calderon stated that Daniele Romeo DiSantillo handed him white latex gloves and told him to put them on. Hector Calderon further stated that he did not put the gloves on, but threw them away in the parking lot behind the pizzeria and 7-Eleven in Romeo's Plaza. Hector Calderon stated that he refused to help Daniele Romeo DiSantillo and returned home. Hector Calderon stated that he received $5,000 from Daniele Romeo DiSantillo for money he invested in opening the Spotswood pizzeria and that Daniel Romeo DiSantillo promised him an additional $3,000 for the time he spent trying to open the restaurant. Hector Calderon further stated that he had no reason to harm Peyman Sanandaji because he did not know Peyman Sanandaji well and did not deal directly with him in any business dealings.

The State and the defense further agreed and stipulated that "Hector Calderon's initial statements saying or implying that Daniele Romeo DiSantillo shot Peyman Sanandaji are false."

Haggerty then read into the record information obtained from the next part of the interview:

Later in the statement, Hector Calderon admitted that he did in fact shoot Peyman Sanandaji. Hector Calderon stated that Daniele Romeo DiSantillo, Peyman Sanandaji and Hector Calderon were in the office. Hector Calderon stated that Peyman Sanandaji began threatening Daniele Romeo DiSantillo and him and their families by yelling and pointing at Daniele Romeo DiSantillo. Hector Calderon stated that Peyman Sanandaji was always armed. Hector Calderon stated that Peyman Sanandaji brought the gun and had the gun first. Hector Calderon further stated that Peyman

Sanandaji put the gun on the table and he, Hector Calderon, grabbed the gun and shot Peyman Sanandaji because he was afraid. Hector Calderon stated that he did not understand what Peyman Sanandaji was saying when Peyman Sanandaji was yelling and that Daniele Romeo DiSantillo was translating. Hector Calderon stated that Daniele Romeo DiSantillo told him that Peyman Sanandaji was threatening Hector Calderon and Daniele Romeo DiSantillo and their families, so Hector Calderon shot him. At the end of the statement, Hector Calderon said that after the shooting, he believed Mr. Romeo DiSantillo may have translated the threats made by Peyman Sanandaji inaccurately.

. . . .

Hector Calderon told police that he never received any benefit for shooting Peyman Sanandaji and he was never offered any benefit.

The State and defendant stipulated that "Hector Calderon was the only shooter of Peyman Sanandaji[,]" that Calderon admitted in his statement that he was the only shooter, and that he "most likely" acquired the .380 and brought it to the pizzeria. They further stipulated that the original owner did not sell or transfer this gun with a holster and that Sanandaji "was legally disqualified from obtaining a firearms purchaser's identification card to purchase a firearm or a permit to carry a firearm" in New Jersey.

On appeal, defendant raises the following points:

POINT I
THE TRIAL COURT ERRED IN ADMITTING A
CONSENSUAL [INTERCEPT] [RECORDING]
DURING TRIAL AND PERMITTING IT TO BE
REPLAYED DURING JURY DELIBERATIONS
OVER OBJECTION BY [DEFENDANT], THUS
DEPRIVING THE DEFENDANT OF A FAIR TRIAL.

A. THE . . . LOWER COURT ERRED IN
ADMITTING CONSENSUAL INTERCEPT
RECORDING UNDER THE CO-CONSPIRATOR
EXCEPTION TO THE HEARSAY RULE, N.J.R.E.
803(b)(5).

B. IT WAS REVERSIBLE ERROR FOR THE
TRIAL COURT TO ADMIT THE RECORDING AND
[TRANSCRIPT] WITHOUT FIRST CONDUCTING A
PRELIMINARY HEARING PURSUANT TO N.J.R.E.
104 AND WITHOUT LATER PROVIDING ANY
LIMITING INSTRUCTION TO THE JURY.

C. THE ADMISSION AND USE OF THE
CONSENSUAL INTERCEPT RECORDING
VIOLATED DEFENDANT'S SIXTH AMENDMENT
RIGHT TO CONFRONT WITNESSES AGAINST
HIM UNDER CRAWFORD V. WASHINGTON, 541
U.S. 36 (2004).

POINT II
THE COURT ERRED IN ADMITTING A TEXT
MESSAGE WITHOUT CONDUCTING AN N.J.R.E.
403 AND 404(b) ANALYSIS AND BY NOT
PROVIDING ANY CURATIVE INSTRUCTION TO
THE JURY REGARDING SAME.

POINT III
THE DEFENDANT WAS DEPRIVED A FAIR TRIAL
AS THE EVIDENCE AND TESTIMONY

OBLIGATED THE LOWER COURT TO INCORPORATE THE LESSER INCLUDED OFFENSES OF MURDER.

POINT IV
DEFENDANT WAS DEPRIVED A FAIR TRIAL DUE TO THE FAILURE OF THE TRIAL COURT TO PROVIDE ADEQUATE LEGAL INSTRUCTIONS TO THE JURY CONCERNING STATE OF MIND, ELECTION NOT TO TESTIFY, INTOXICATION AND SELF DEFENSES.

POINT V
THE LOWER COURT ERRED IN DENYING [A] MOTION BY DEFENDANT FOR [JUDGMENT] OF ACQUITTAL AND A NEW TRIAL. AND THE CUMULATIVE EFFECT OF THE ERRORS BELOW REQUIRE REVERSAL OF CONVICTION.

I.

Defendant challenges the admission of the consensual intercept call with Calderon. Defendant willingly made the call while "assisting" the police, before he became a suspect, but he now argues that the judge erred by admitting the recording pursuant to the co-conspirator exception to the hearsay rule, N.J.R.E. 803(b)(5), without a Rule 104 hearing and without a limiting instruction to the jury. He further contends that the admission of the consensual intercept violated his Sixth Amendment right to confront witnesses.

Defendant did not request either a Rule 104 hearing or a limiting instruction. Ordinarily we review a trial court's evidentiary determinations with

27

substantial deference.  State v. Cole, 229 N.J. 430, 449 (2017).  A trial court's ruling on the admissibility of evidence will be reversed "only if it constitutes an abuse of discretion."  Ibid. (quoting State v. Kuropchak, 221 N.J. 368, 385 (2015)).  No abuse of discretion occurred here.

The trial judge found that Calderon's recorded statements, made shortly after the murder, were intended to hide his and defendant's involvement and thus conceal the conspiracy.  He therefore opined that the conspiracy was ongoing when the conversation occurred—it was "made to ensure the ongoing attempt to conceal evidence."

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  N.J.R.E. 801(c).  Such statements are inadmissible unless they fall within one of the exceptions to the hearsay rule.  State v. Savage, 172 N.J. 374, 402 (2002).  The hearsay exceptions "are justified primarily because the circumstances under which the statements are made provide strong indicia of reliability."  Ibid. (quoting State v. Phelps, 96 N.J. 500, 508 (1984)).

The co-conspirator exception provides that a statement may be admissible against a party if the statement is "made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement

was made in furtherance of that plan." N.J.R.E. 803(b)(5). "The rationale for the co-conspirator exception is that 'because conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan.'" Savage, 172 N.J. at 402 (quoting State v. Harris, 298 N.J. Super. 478, 487 (App. Div. 1997)).

"[A] conspiracy may continue beyond the actual commission of its objective if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled to avoid apprehension." Id. at 405. Likewise, any scheme to avoid apprehension and prosecution continues a conspiracy. State v. Soto, 340 N.J. Super. 47, 65 (App. Div. 2001) (holding a statement made after a crime was over was in furtherance of the conspiracy to evade capture), overruled on other grounds, State v. Dalziel, 182 N.J. 494 (2005); State v. Cherry, 289 N.J. Super. 503, 523 (App. Div. 1995) (holding statements by co-conspirator to establish a plan to prevent detection of himself and, in turn, the defendant furthered the conspiracy). "Moreover, statements relating to past events may be admissible if they are 'in furtherance' of the conspiracy and 'serve some current purpose, such as to provide cohesiveness, provide reassurances to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals

of the conspiracy.'" Savage, 172 N.J. at 403 (quoting State v. Taccetta, 301 N.J. Super. 227, 253 (App. Div. 1997)).

A conspiracy continues until its object is complete or proof exists that a member has withdrawn. Cherry, 289 N.J. Super. at 523. It continues "until each and every conspiratorial objective and goal" is accomplished. Harris, 298 N.J. Super. at 488. To qualify for admission under the co-conspirator exception, three conditions must be met: "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'" Savage, 172 N.J. at 402 (quoting Phelps, 96 N.J. at 509-10).

The recording in this case readily met the three conditions. Calderon's statements were intended to advise defendant on how to avoid detection, such as when defendant asked Calderon "[w]hat are we going to do now?" and Calderon responded with "it's best you go buy a ticket and go to Italy." Calderon advised defendant that "[i]t's best that we don't get together, so nothing is known." Calderon repeatedly urged defendant to go to Italy and not communicate further with him. The victim's murder did not end the conspiracy.

Defendant and Calderon needed to advance their mutual interest in escaping discovery.

That police suggested areas of discussion to defendant did not take the conversation out of the conspiratorial context, contrary to defendant's argument, urged particularly in oral argument. Even if defendant covered topics the police suggested, it was clear from Calderon's responses that his main concern was that he and defendant avoid detection. Defendant repeatedly asked Calderon "what are we going to do now" and "what do you want me to do?" These open-ended questions were intended to engage Calderon in a conversation in furtherance of the conspiracy, even if the police were present.

The facts in this case are somewhat unusual in that defendant at various points in time contacted the authorities for their assistance regarding the victim, even immediately prior to the murder, and cooperated by making the phone call. These efforts could have been interpreted as defendant intending to deflect suspicion in light of the fact that tracing withdrawals and deposits would show that the victim paid him substantial amounts of money, supposedly to invest in businesses, which simply disappeared into thin air. Defendant participated in the conspiracy while attempting to make himself appear innocent—notions not in conflict.

A-4457-16T2

"[T]he appropriate test should be whether the prosecution has demonstrated by a fair preponderance of evidence that the conspiracy existed and that the defendant participated in it."  Phelps, 96 N.J. at 518.  A court may consider a co-conspirator's reliable hearsay declaration if there is other substantial evidence of the conspiracy and the defendant's participation in it.  Id. at 518-19.  The State presented ample independent proof of the existence of the conspiracy and defendant's participation in it.

The day of the shooting defendant called Meglio to say that he owed Sanandaji money and feared retaliation if he did not pay it back, an attempt to set the stage for what might follow.  Garcia saw defendant speaking with Calderon several times that day and Palaez confirmed that he drove Calderon to and from Romeo's Plaza.  Moreover, instead of taking Meglio's advice to call the police, defendant had dinner with Sanandaji and Calderon in the office of a closed restaurant.  Defendant admitted that he asked Calderon to be there and knew Calderon had a gun before the victim arrived.  After the murder, defendant called Calderon and asked him to return to Romeo's Plaza.  A video showed defendant and Calderon walking along the plaza.  Garcia said he saw them return together.  Calderon's driver confirmed that he picked up Calderon in front of the 7-Eleven at 10:51 p.m. and that Calderon was in a "serious mood" and appeared

32

intoxicated.  Defendant called Prosniewski after Calderon left, but never told him about the shooting.  He did not report the crime until he saw Kelly in his patrol car around "11:14, 11:15" that night, more than two hours later.

Thus, independent of the consensual intercept, there was a fair preponderance of the evidence showing that defendant participated in a conspiracy to murder Sanandaji.  The court did not abuse its discretion by admitting the consensual intercept into evidence under the co-conspirator exception to the hearsay rule.

Defendant's contention that the court erred by admitting the evidence without either a Rule 104 hearing or a limiting instruction is also reviewed under the plain error standard.  Such errors have to be clearly capable of producing an unjust result.  See R. 2:10-2.  "With a jury trial, the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Transcripts of the recorded conversations were given to jurors to serve, as the judge said, merely as "guides" and "not evidence."  He further explained the use of the guides was appropriate because the conversation needed to be translated into English and because of the speed of some portions of the

dialogue.  As he said, "[s]ometimes it's easier to have something in writing.  So that's all they are for you."  The jury while deliberating asked to hear the intercepted call again, and were given the transcripts.  The lack of a limiting instruction on the last occasion, and without a Rule 104 hearing at any time, is irrelevant.

As to the need for a Rule 104 hearing, a <u>Driver</u>[6] hearing is required only when there are audibility issues.  Gauging from the record, there were no audibility issues in this case.

Furthermore, defendant's reliance on <u>State v. Miller</u>, 205 N.J. 109, 122-23 (2011), is misplaced.  The <u>Miller</u> guidelines apply to video testimony, not to audio recordings of a consensual intercept call.  In <u>Miller</u>, the Court stressed the importance of judges cautioning juries about placing undue emphasis on the particular testimony that is replayed.  <u>Ibid.</u>  However, that is a different scenario from the one here, where the recorded conversation was actually in furtherance of the conspiracy.  Even if the jury might have benefitted from a limiting instruction, defendant's statements, his DNA on the .357 Magnum and holster, and the undisputed evidence of his repeated calls to, and meetings with, Calderon after the murder provide substantial circumstantial evidence of guilt.

---

[6]  <u>State v. Driver</u>, 38 N.J. 255, 287-88 (1962).

The absence of a jury instruction regarding the transcript during the jury's rehearing was not capable of producing an unjust result. R. 2:10-2.

Furthermore, the purpose of a Driver hearing is to determine the following:

> [if] the speakers [are] identified and . . . (1) the device was capable of taking the conversation or statement, (2) its operator was competent, (3) the recording is authentic and correct, (4) no changes, additions or deletions have been made, and (5) in instances of alleged confessions, . . . the statements were elicited voluntarily and without any inducement.
>
> [Driver, 38 N.J. at 287.]

There was no dispute as to the identity of the speakers, audibility, or the integrity of the recordings. We presume no Driver hearing was requested by anyone because none was necessary. See State v. King, 215 N.J. Super. 504, 516 (App. Div. 1987) (holding no Driver hearing requested because tape recording obviously met Driver requirements). No prejudice resulted from the lack of a Driver hearing in this case.

Defendant's contention that the proficiency of the interpreter was not sufficiently explored also carries no weight. Nothing in the record reflects a concern during the trial.

Defendant also argues that the admission of the recordings violated his rights pursuant to the principles enunciated in Crawford v. Washington, 541 U.S. 36, 53-54 (2004). We do not agree. The consensual intercept was simply not testimonial material that triggered those protections. It is well established that the co-conspirator exception to the hearsay rule "does not offend the Sixth Amendment's guarantee of a defendant's right to confront the witnesses against him[.]" Savage, 172 N.J. at 402 (citing Bourjaily v. United States, 483 U.S. 171, 183-84 (1997)).

## II.

Defendant also contends the court erred in admitting a text message sent by defendant without conducting an N.J.R.E. 403 and 404(b) analysis, or providing a limiting instruction to the jury.

The State argued that two text messages were admissible as statements of a party opponent under N.J.R.E. 803(b)(1). The messages were recovered from defendant's cell phone and were sent three days prior to the shooting. The first text message read: "But.he thinks.this.big.pay day is coming and it's not that's were this mo fucker is.gonna.end.up having to shoot himself[.]" The second message read: "I ain't goin back to 2 years ago koto fuck that[.]" The parties

stipulated that defendant was talking to someone unrelated "in any way" to this case.

During argument before the trial judge, the State conceded that the second text message was not relevant and that it was "fine" if the court wanted to excise it. Defense counsel then represented to the court that if it admitted only the statement, "But.he thinks.this.big.pay day is coming and it's not," he would withdraw his objection "to put everything else in." He explained that the statement "fits in the context of the case," because no one disputed that Sanandaji wanted his money back and that defendant did not have it.

At that point, the court indicated that it thought the "money part" of the message was "clearly in this case," to which defense counsel replied, "I do agree." The court then preliminarily ruled that the statement was admissible under Rule 803(b)(1) and that it was relevant. The parties stipulated that the statement did not require authentication.

The judge said that the part of the statement referring to money was admissible and that the State could place it into evidence without authentication from any witness. The court also ruled that the second part of the message was not relevant because there was no logical connection between the proffered evidence and a fact in issue. It did not refer to a murder or conspiracy and the

jury could interpret it "in many ambiguous different ways."  Additionally, the second part of the text was inadmissible because its probative value was outweighed by its apparent prejudice.

The judge said he would instruct the jury that the State was proffering the text only "to demonstrate that the defendant acknowledged that he owed money to the victim."  At that point, defense counsel stated that he "would not want that" instruction and specifically requested that the court give "no instruction." The attorney explained:

> . . . I think this statement is subject to two different interpretations.  One could be the one your [h]onor just said in the implications, I think the State would argue, another could be that he thinks that the business is already generating big profits and he's entitled to it, and we have a different position on that. So, <u>I have no objection to the statement going in without any limiting instruction</u> and just leave it to fair comment . . . by the parties.
>
> [(emphasis added).]

The court asked:  "So you wouldn't want me to give a limiting instruction at the time it goes in nor as part of the jury charge?"  Defense counsel replied:  "That's correct, sir.  It's just a piece of evidence for them to consider."

The court memorialized the oral decision in its order. In the accompanying "Supplemental Reference: Motion to Admit Text Messages," the judge stated the ruling was based in part on Rule 803(b)(1).

The judge also found that the first part of the statement was relevant because it had a logical connection to a fact in issue. The second part, however, was not relevant to the charges of murder or conspiracy to commit murder. The judge explained:

> The State is asking the Court to allow the jury to infer that the phrase "that's where this mo fucker is gonna end up having to shoot himself" can be logically connected and is therefore relevant. Rather than allowing a jury to infer a fact from that phrase I find it would require speculation on the part of the jury. It is not "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." State v. Wilson, 135 N.J. 4, 13 (1994).

The next day, the State advised the court that the parties had stipulated to the authentication of the text message and that defense counsel had agreed to allow the State to introduce the statement during its direct examination of Brubaker in return for the State's agreement not to file an interlocutory appeal on the court's evidential ruling. Brubaker subsequently read the statement to the jury, testifying that in the context of the entire thread of text messages, it appeared that defendant was talking about Sanandaji.

39

Defendant agreed at trial that the evidence was relevant. It was admitted as evidence under Rule 803(b)(1) as a statement by a party opponent and defendant does not challenge that ruling on appeal. Where a statement is admitted under the rule, however, it may also be offered as substantive evidence so long as it is relevant. See State v. Covell, 157 N.J. 554, 573-74 (1999).

When the court applied the balancing test under Rule 403, it found that the victim's expectation of a big "pay day" was relevant "as it relates to testimony elicited concerning money allegedly owed by defendant to the victim." It therefore found that the statement had a logical connection to a fact at issue. It also found pursuant to the Rule 403 balancing test, that the statement's probative value outweighed the prejudicial effect. The judge specifically mentioned that he was not engaging in a Rule 404 analysis or a Cofield[7] analysis because he thought it was not necessary. Now defendant objects on appeal, although it was conceded below that the statement was relevant. Defendant agreed to the admission of that language so long as the other text messages were not admitted. At this juncture, the doctrine of invited error applies. We will not consider the argument further. See State v. Jenkins, 178 N.J. 347, 359 (2004).

---

[7] State v. Cofield, 127 N.J. 328, 338 (1992).

Defense counsel also requested the judge not give an instruction to the jury when the text was admitted. Now on appeal, it is argued that the judge should have followed his initial instinct and given such an instruction because the text message was only relevant on the count of theft by deception, but was highly prejudicial in the context of murder and conspiracy.

Not only did defense counsel fail to request a limiting instruction, counsel twice rejected the court's offer to give one. The presumption that none was necessary is bolstered by the fact that defendant's financial situation and relationship to the victim were not disputed at trial. See State v. McGraw, 129 N.J. 68, 80 (1992) (holding a failure to request an instruction gives rise to a presumption that counsel did not view its absence as prejudicial).

As counsel said at trial, the statement referring to money "fits into the context of the case." Thus, defendant should not be heard to argue something different on appeal. Jenkins, 178 N.J. at 359. Although the court did not give a limiting instruction, it repeatedly explained in the final charge that the jury had to find beyond a reasonable doubt that defendant committed the offenses in order to convict. The court's failure to give an instruction, or engage in any 403 or 404(b) analysis, was not error capable of producing an unjust result. Other evidence confirmed that money was a central issue in the case.

## III.

We turn to defendant's contentions regarding the court's obligation to instruct on lesser-included offenses, state of mind, election not to testify, intoxication, and self-defense. Defense counsel requested the court instruct the jury on the lesser-included offenses of murder, but at the close of the evidence, the request was withdrawn.

Defense counsel told the judge:

> As this trial was winding down, . . . as I understood the State's theory clearly, not only from the opening but also from the witnesses that were called, the State's theory in the case is that this was essentially a contract hit, it was planned and agreed to between Hector Calderon and my client. And all of the statements that were made after the fact are an attempt to make it look like it was spontaneous and unanticipated. And I'm certainly not putting words or trying to put words in [the prosecutor]'s mouth, but if the jury were to find that, [the prosecutor] would be the big winner in this case.
>
> Against that, we say, as my client did in the statements that your [h]onor heard several times, for hours and hours, that this was completely unanticipated, he did not plan it or know it was going to happen or even want it and this was completely the independent volition of . . . Calderon from which he should have no liability as to the conspiracy and as to the murder.
>
> And that's the way we've cross-examined and presented our case, and I think your [h]onor having sat

through this, I think it's in sharp relief, the parties' position, and the case is really that simple.

Given that issue, I sat with the client several times during the course of the trial but most especially for a great long while yesterday after we broke early, both with him alone and also with him and his parents, and then again today for about an hour and a half before we came to court late on a Friday to talk about the jury charge. And in addition to which [defendant], I'm not waiving any privilege, has actually signed a letter to me in my file as to what his decision is.

He has decided after listening to my advice that he wishes not to have any lesser included offenses of aggravated manslaughter, reckless manslaughter or heat of passion reducing murder to manslaughter. His reasoning I think is very sound which is why give the jury more choices when our position is we didn't want this, we didn't participate in it and we didn't cause it, and he does not want to compromise, and he wishes to have a jury make a simple decision which he hopes and expects would be that he's not guilty of conspiracy or murder.

Frankly, your [h]onor, I agree with that decision. I've given it careful thought myself. It's a huge decision in terms of the ramifications and I made that clear to him, both in our various meetings and also in writing where I spelled out what the maximum sentences are if we would do all the lesser includeds and were to get convicted of a lesser offense versus murder.

I told him to think about it overnight, talk to his family about it and meet with me again today, and this is the decision that he has come to with my advice and counsel with which I agree. And ultimately it's his decision and it's a decision I agree with and, frankly, if

43

I disagreed with it and he told me he wanted to do it anyway, I'd be saying the exact same things to your [h]onor.

THE COURT: [Defense counsel], just so we're clear, we're talking about the lesser includeds with respect to conspiracy and the murder charge?

[Defense counsel]: Exactly. Exactly.

And Mr. DiSantillo, you've heard me say all that I said to his Honor?

THE DEFENDANT: Yes, [defense counsel].

[Defense counsel]: And do you agree with that?

THE DEFENDANT: Yes, sir.

[Defense counsel]: And actually everything I said was contained in the letter that you signed as to your choice?

THE DEFENDANT: Yes, sir.

[Defense counsel]: And in that letter I actually gave you two choices, one is no lesser includeds, and the other one was ask the [c]ourt to include them.

THE DEFENDANT: Yes, sir.

[Defense counsel]: And I also indicated that no matter what you and I decided, that his [h]onor under the law has an independent obligation to see if there . . . would be a lesser included even if I didn't ask for it and [the prosecutors] didn't ask for it; right?

THE DEFENDANT: Yes, sir.

44

> [Defense counsel]: And you understand all of that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Thank you. [Prosecutor], you also wanted to pu[t] your position on the record and I ask you to do that.

The State argued that there was no evidence of reckless or aggravated manslaughter or heat of passion provocation. At the time of the shooting, the victim was unarmed. Nothing in the record indicated that the victim had been physical with anyone.

"No defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense that is clearly indicated in the record." State v. Garron, 177 N.J. 147, 180 (2003). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." Jenkins, 178 N.J. at 361.

"[C]ourts are required to instruct the jury on lesser-included offenses only if counsel requests such a charge and there is a rational basis in the record for doing so or, in the absence of a request, if the record clearly indicates a charge is warranted." State v. Denofa, 187 N.J. 24, 42 (2006); N.J.S.A. 2C:1-8(e). However, when a defendant fails to ask for such a charge, the court is not

required "to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." Denofa, 187 N.J. at 42. "Only if the record clearly indicates a lesser-included charge—that is, if the evidence is jumping off the page—must the court give the required instruction." Ibid. As the Court explained in State v. Alexander, 233 N.J. 132, 143 (2018) (citations omitted):

> The "clearly indicated" standard does not require trial courts either to "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty," . . . or "'to meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain' a lesser charge," . . . . Instead, the evidence supporting a lesser-included charge must "jump[] off the page" to trigger a trial court's duty to sua sponte instruct a jury on that charge.

Our courts therefore "decline to impose such a burdensome requirement on trial courts or suggest that every potential lesser-included offense must be charged to the jury." State v. Funderburg, 225 N.J. 66, 83 (2016) (holding the defendant was not entitled to a jury instruction on attempted passion/provocation manslaughter because the facts did not "clearly indicate" that objective elements were present).

Given that defendant asked the judge not to give lesser-included instructions, in the absence of anything in the record supporting them, the judge could not have charged lesser-includeds. There was no possibility of plain error.

The court did initially indicate that it would charge the jury about election not to testify. It inadvertently failed to do so and defense counsel did not object.

"[T]he right of an accused in any criminal action not to be called as a witness and not to testify has long been a part of New Jersey law . . . ." State v. Bogus, 223 N.J. Super. 409, 421 (App. Div. 1988). The failure to instruct the jury that it may not draw an adverse inference based on a defendant's failure to testify is of constitutional dimension. State v. Camacho, 218 N.J. 533, 545-46 (2014). Therefore, "a criminal trial judge must give a 'no-adverse-inference' jury instruction when requested by a defendant to do so." Id. at 546 (quoting Carter v. Kentucky, 450 U.S. 288, 300 (1981)). However, "a Carter instruction is not required in every criminal trial; it is merely available if a defendant so requests." Camacho, 218 N.J. at 552 (holding a court's inadvertent failure to give a Carter instruction was harmless in context of overwhelming evidence and repeated statements by the court and counsel concerning the State's burden and the defendant's right not to testify). The judge's omission in this case was not

prejudicial in the absence of a request to begin with, or an objection when the court failed to give one. Id. at 554-55.

We agree with defendant that appropriate jury instructions are essential to a fair trial. The claim that the intoxication instruction should have been given, however, entirely lacks merit. The charge is given only when there is a rational basis to conclude that a "defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." State v. Mauricio, 117 N.J. 402, 418-19 (1990). No evidence in the record supports the instruction.

Defendant also states that the court erred in failing to instruct the jury about his state of mind, an instruction that would have been built into lesser-included offenses of aggravated and reckless manslaughter. Defendant now argues the court should have read the proposed instruction in State v. Bielkiewicz, 267 N.J. Super. 520, 533 (App. Div. 1993), which addressed accomplice liability. In this case, however, defendant was charged with the crime of conspiracy to commit murder, not accomplice liability. This argument has no merit either.

Defendant now also claims that the court's instruction on his statements was inadequate and that the court erred by failing to include the facts surrounding the taking of his statements. This argument is not supported by any

case. Clearly, the statements were the subject of pretrial motions and were discussed at the charge conference. The final charge to which counsel agreed stated:

> There is also . . . for your consideration in this case a video statement allegedly made by the [d]efendant. If you find that that statement was made and that part or all of the statement is credible, you may give what weight you think appropriate to the portion of the statement you find to be truthful and credible.

Nothing additional needed to be said.

Finally, defendant contends that the charge of self-defense should have been given. No facts in the record support the claim. In fact, in his third statement to law enforcement officials, defendant actually said he did not feel threatened by Sanandaji. This certainly runs contrary to any claim that such a charge should have been given.

By follow-up letter, filed after regular briefing, defendant contended that he should have been entitled to a self-defense or defense of others instruction given that Calderon said he shot the victim because he was afraid. The record does not include any proof that would have justified that instruction.

IV.

Finally, defendant contends that the court erred in denying his motion for judgment of acquittal and a new trial, and that the cumulative effect of the errors

49

require reversal. In denying his motion for a judgment of acquittal, the trial judge explained:

> Those facts the State presented included the obvious fact that the victim . . . was murdered and had been shot three times. The evidence also included statements from the defendant to the police which implicated the defendant in having arranged a meeting with the victim and included the codefendant, . . . Calderon.
>
> The evidence further included statements by the defendant that were contradictory and that they established credibility issues for the defendant. This included evidence by way of video surveillance of the defendant and codefendant walking together after the shooting, near where the victim lay deceased. There was also testimony that the defendant and the victim were involved in a business deal that was generating significant problems between the two individuals.

The court also found that the proofs as to counts three and five were sufficient in that defendant had possession of the .380 Micro Desert Eagle and .357 Magnum firearms. The court further found that the DNA evidence was sufficient to demonstrate his possession of these handguns was for an unlawful purpose. Finally, Malinow's testimony, defendant's own statements, and his bank records and those of his wife and the victim, established a sufficient basis for a reasonable jury to find him guilty of financial facilitation and theft by deception. The evidence was, in the court's opinion, more than sufficient to deny defendant a new trial as well.

Rule 3:18-2 provides that "[i]f the jury returns a verdict of guilty . . . a motion for judgment of acquittal may be made, . . . [and] [t]he court on such motion may set aside a verdict of guilty and order the entry of a judgment of acquittal . . . ." A court applies the same standard when deciding a motion for a judgment of acquittal under Rule 3:18-1 (a motion made before submission to a jury) or Rule 3:18-2. State v. Papasavvas, 170 N.J. 462, 521 (2002) (Coleman, J., dissenting). The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." State v. Williams, 218 N.J. 576, 594 (2014). "Under both Rules 3:18-1 and -2, the court 'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" Papasavvas, 170 N.J. at 521 (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

"An appellate court will apply the same standard as the trial court to decide if a judgment of acquittal was warranted." State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006) (citing State v. Moffa, 42 N.J. 258, 263 (1964)). To assess the sufficiency of evidence on an acquittal motion, an

appellate court applies a de novo standard of review.  <u>Williams</u>, 218 N.J. at 593-94.

Under <u>Rule</u> 3:20-1, "[t]he trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice."  The trial judge, however, must not set aside a jury verdict "as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law."  <u>Ibid.</u>; <u>State v. Labrutto</u>, 114 N.J. 187, 207 (1989).  An appellate court applies the same standard in reviewing a trial court's decision on a new trial motion.  <u>Dolson v. Anastasia</u>, 55 N.J. 2, 7 (1969).

Defendant argues that a motion for judgment of acquittal is concerned "only [with] the existence of legally sufficient, competent evidence to sustain a conviction," and that the court's analysis consisted of three sentences in its overall decision.  Although he does not fully argue the issue under <u>Rule</u> 3:18-2, defendant suggests that the State's case rested "solely on speculation and innuendo[,]" and that the State relied on inadmissible evidence such as the consensual intercept call and the text message.  We simply do not agree with defendant's claims.  The judge's decision both to deny the motion for acquittal and the motion for a new trial was unimpeachable.

A reasonable jury could well have found defendant guilty based on the proofs presented as to each count. The jury had the opportunity to listen to defendant's statements, which, while defendant intended them to be exculpatory, were actually inculpatory. Our review of the record establishes that there was sufficient evidence from which the jury could have found defendant guilty beyond a reasonable doubt as to each count. Thus, the judge's denial of these motions was proper in each instance.

Since there were no trial errors at all, defendant's argument that any cumulative effect requires reversal lacks merit.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4457-16T2